B1040 (FORM 1040) (12/15)

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Generation Zero Group, Inc. and
Find.Com URL Holding, LLC

**DEFENDANTS**
Phoenix Restructuring, Inc. *et al.*

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Felton Parrish
Hull & Chandler, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, NC 28203  Phone:  704-375-8488

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☒ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☒ Creditor        ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
This is an action seeking (i) recharacterization of purported secured claims as disguised equity interests or, in the alternative, equitable subordination, (ii) declaratory judgment regarding the validity of the membership interests of Generation Zero Group, Inc. in Find.Com URL Holding, LLC, (iii) damages for breach of fiduciary duty, and (iv) a preliminary injunction to prevent purported secured creditors from taking any action to exercise control over Find.Com URL Holding, LLC or the Find.Com domain name pending the resolution of this adversary proceeding.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Generation Zero Group, Inc. and Find.Com URL Holding, LLC | BANKRUPTCY CASE NO.<br>20-30319 and 20-30320 | |
| DISTRICT IN WHICH CASE IS PENDING<br> Western District of North Carolina | DIVISION OFFICE<br>Charlotte | NAME OF JUDGE<br> Whitley |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br> /s/ Felton E. Parrish | | |
| DATE<br><br> March 13, 2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Felton Parrish | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>GENERATION ZERO GROUP, INC. and FIND.COM URL HOLDING, LLC,<br><br><br><br>Debtors. | Case No.: 20-30319<br><br>(Joint Administration Requested)[1]<br><br>Chapter 11 |
| GENERATION ZERO GROUP, INC. and FIND.COM URL HOLDING, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>PHOENIX RESTRUCTURING, INC., a Delaware corporation; CROSSHILL GEORGETOWN CAPITAL L.P., a Delaware limited partnership; JAMES HENDRICKSON; G. THOMAS LOVELACE; HOYT LOWDER; CYNTHIA WHITE; CHARLES WALDO; ESTATE OF RON ATTKISSON; and the Noteholders identified on Exhibit A<br><br>Defendants. | Adversary Proceeding No.:  20-_____ |

## DEBTORS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES FOR BREACH OF FIDUCIARY DUTY

Generation Zero Group, Inc. ("**GNZR**") and Find.Com URL Holding, LLC ("**URL Holding**" and together with GNZR, the "**Debtors**"), debtors in the above-captioned chapter 11 cases file this Complaint alleging as follows:

---

[1] Contemporaneously with the filing of this complaint, the Debtors filed a joint motion requesting that their chapter 11 cases be consolidated for procedural purposes only and administered jointly.

## INTRODUCTION

1.      The Debtors' primary asset is the internet domain name Find.Com (the "**Domain Name**").  The Domain Name is owned by URL Holding which is a wholly-owned subsidiary of GNZR.

2.      The Debtors have been unable to monetize the value of the Domain Name, in part, because of certain disputes with the holders (the "**Noteholders**") of purported secured notes issued by GNZR (the "**GNZR Notes**").[2]

3.      The Debtors commenced their chapter 11 bankruptcy cases with the goal of resolving the disputes with the Noteholders and maximizing the value of the Domain Name through either a plan of liquidation or plan of reorganization.

4.      The GNZR Notes are purportedly secured by a security interest in substantially all of the Debtors' assets including the Domain Name.  Defendant Phoenix Restructuring, Inc. ("**Phoenix**" or "**Collateral Agent**") is the collateral agent for the Noteholders and is, upon information and belief, the entity with authority to exercise any enforcement rights on behalf of the Noteholders.

5.      Defendants CrossHill Georgetown Capital L.P., Jay Hendrickson, Tom Lovelace, Hoyt Lowder, Cynthia White, Charles Waldo, and the Estate of Ron Attkisson (collectively, the "**Controlling Noteholders**") collectively own more than 50% of the purported notes and, based on that collective majority ownership, have been directing the actions of the Collateral Agent and attempting to take actions on behalf of all Noteholders.

---

[2] By referring to the purported secured notes as the "Notes" and the holders of those notes as "Noteholders", the Debtors are not conceding that the Notes are valid debt obligations of the Debtors. Rather, as explained herein, the Debtors believe that the Notes are actually disguised equity interests and should be recharacterized as such.

6.     The remaining defendants are all holders of the purported notes but generally have not been activist investors.

7.     As explained in more detail below, the GNZR Notes were issued by GNZR in June 2010 as part of a transaction in which the Noteholders contributed to GNZR their interests in an entity that owned the Domain Name in exchange for the GNZR Notes and stock in GNZR. GNZR defaulted on the GNZR Notes almost immediately upon their issuance by failing to make the initial principal payment that was due thirty days after the notes were issued. The Noteholders declared the GNZR Notes to be in default November 2010, just five months after the notes were issued.  Despite that default, the Noteholders never commenced any enforcement action and, instead, entered into a series of forbearance agreements in which they agreed that interest on the Notes would not accrue.  The most recent forbearance agreement expired in January, 2017.  GNZR has never made any principal or interest payments on the purported notes.

8.     In 2018 and 2019, GNZR began a two-pronged strategy to either (i) raise additional funds to help the Debtors complete the development of the technology that the Debtors intended to use in connection with the Domain Name or, alternatively, (ii) enter into a transaction that would allow the Debtors to monetize the value of the Domain Name through either a licensing or sale transaction.

9.     As part of this process, GNZR learned through communications with various investment professionals that it would be unlikely to raise additional funds for technology development given the company's complicated structure and history.

10.    Although GNZR was unable to secure additional investments in the company, GNZR did generate interest from several entities that were interested in pursuing a transaction

for use of the Domain Name.  At least two of the potential transactions provided a possibility for GNZR to generate funds in excess of the amounts purportedly owed to the Noteholders.

11.     Despite this (or perhaps because they recognized the potential value of the Domain Name), the Controlling Noteholders refused to consider any restructuring transaction other than a consensual foreclosure by which the Debtors would simply transfer the Domain Name to the Collateral Agent and allow the Noteholders to obtain all the residual value of the Domain Name even if that value exceeded the amount owed on the GNZR Notes.

12.     After the Controlling Noteholders were informed that the Debtors would not agree to transfer the Domain Name to the Collateral Agent through a consensual foreclosure, the Debtors were notified that Phoenix, in its capacity as collateral agent, had purportedly cancelled all of GNZR's membership interests in URL Holding and that Phoenix claimed to be the sole owner of the membership interests in URL Holding.

13.     Neither Phoenix nor the Controlling Noteholders made any attempt to comply with the foreclosure provisions of Article 9 of the Uniform Commercial Code and, instead, have claimed that Phoenix was authorized to cancel GNZR's membership interests in URL Holding without having to comply with Article 9.

14.     GNZR disputes that its interests in URL Holding were cancelled and contends that it remains the sole member of URL Holding.

15.     In this adversary proceeding, the Debtors seek the following relief:

a.  the recharacterization of the GNZR Notes as disguised equity interests;

b.  in the event that the GNZR Notes are not recharacterized as disguised equity interests, the equitable subordination of the GNZR Notes held by the Controlling Noteholders;

4

c. a declaration that the purported cancellation of GNZR's membership interests in URL Holding was invalid, void and of no effect;

d. a declaration that GNZR, as the sole member of URL Holding, is the person authorized to commence the chapter 11 case on behalf of URL Holding and manage URL Holding as debtor-in-possession, or, in the alternative, the appointment of a receiver over the assets of URL Holding;

e. a preliminary injunction to prevent Phoenix or any Noteholder from taking any action to assert management or control over URL Holding or its assets, including the Domain Name, pending the resolution of this adversary proceeding; and,

f. an award of damages against the Controlling Noteholders for breach of fiduciary duty.

## Jurisdiction and Venue

16. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O).

17. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## Parties

18. Plaintiff GNZR is a Nevada corporation with its principal place of business in North Carolina.

19. Plaintiff URL Holding is a Georgia limited liability company with its principal place of business in North Carolina.

20.     Defendant Phoenix is a Delaware corporation that, upon information and belief, serves as the collateral agent for the Noteholders.  Upon information and belief, the principal place of business of Phoenix is located in North Carolina.

21.     Defendant CrossHill Georgetown Capital L.P. ("**CrossHill**") is a Delaware limited partnership with its principal place of business located in Alexandria, Virginia.  The general partner of CrossHill is Stephen Graham.

22.     Defendant James Hendrickson ("**Hendrickson**") is a resident of Raleigh, North Carolina.

23.     Defendant Tom Lovelace ("**Lovelace**") is a resident of Columbia, South Carolina.

24.     Defendant Hoyt Lowder ("**Lowder**") is a resident of Tampa, Florida.

25.     Defendant Cynthia White ("**White**") is a resident of Charlotte, North Carolina.

26.     Defendant Charles Waldo ("**Waldo**") is a resident of Charlotte, North Carolina.

27.     Ron Attkisson was a resident of Atlanta, Georgia.  Mr. Attkisson deceased on May 4, 2013.  Upon information and belief, the Estate of Ron Attkisson ("**Attkisson**") is the current holder of the GNZR Notes originally issued to Mr. Attkisson.

28.     Defendants CrossHill, Hendrickson, Lovelace, Lowder, White, Waldo, and Attkisson collectively own more than 50% of the purported notes and constitute the Controlling Noteholders.

29.     The remaining Defendant Noteholders are identified on Exhibit A (the "**Passive Noteholders**").  The Passive Noteholders have not been active investors or participants in the company.  They are included as defendants in this adversary proceeding based solely upon GNZR's claim that all GNZR Notes (including those held by Passive Noteholders) should be

characterized as equity interests.   No other relief is sought with respect to the Passive Noteholders.

**Background**

**A.      The Formation of GNZR.**

30.      GNZR was formed as a Nevada corporation on May 16, 2006 under the name Velocity Oil & Gas, Inc. ("**Velocity**").  Velocity originally operated as a start-up entity with the intention of being involved in oil and gas exploration and development with a geographic focus in Texas and Louisiana.

31.      By 2009, Velocity was nothing more than a dormant public shell corporation.

32.      In November 2009, Matthew Krieg, through another entity, acquired a controlling interest in Velocity.

33.      In February, 2010, Matthew Krieg, in his capacity as sole director of Velocity, and through his beneficial ownership of the right to vote 51% of Velocity's voting shares, changed the company's name from Velocity to Generation Zero Group, Inc.

34.      Upon the company's change of name, GNZR changed its business focus to internet, technology and entertainment related businesses, and closed on acquisitions of certain technologies and existing internet businesses.

35.      Upon information and belief, Matthew Krieg was a business associate and acquaintance of Marc Bercoon ("**Bercoon**") and William Goldstein ("**Goldstein**").

36.      As described in more detail below, Bercoon and Goldstein controlled entities that owned the Find.Com Domain Name and related technology.  It is believed that Matthew Krieg acquired the controlling interests in GNZR with the support and backing of Bercoon and

7

Goldstein.  As discussed in more detail below, Bercoon and Goldstein were subsequently convicted for securities fraud based on their dealings with Find.Com Acquisition.

**B.     The Find.Com Technology Acquisition**

37.     During April 2010, GNZR entered into an Asset Purchase Agreement with Find.com Acquisition, Inc. to acquire all of Find.com Acquisition's interest in and ownership of the technology assets that powered the operations of the www.Find.com website and all associated intellectual property rights (the "**Technology Assets**").  The Technology Assets did not include the Find.com Domain Name itself but only included certain technology used in connection with the Domain Name.

38.     To acquire the Technology Assets, GNZR issued 10,000,000 shares of restricted common stock to Find.com Acquisition.  Find.com Acquisition subsequently distributed the shares to its shareholders so that the prior shareholders of Find.Com Acquisition became shareholders of GNZR.

39.     Upon information and belief, at the time of the transaction between GNZR and Find.Com Acquisition, Bercoon was the President of Find.Com Acquisition and Goldstein was the Chief Executive Officer of Find.Com Acquisition.

**B.     The Domain Name Acquisition**

40.     At approximately the same time that it was trying to acquire the Technology Assets from Find.Com Acquisition, GNZR was also involved in transactions to acquire the Domain Name.

41.     In early 2010, the Domain Name was owned by Will Find, LLC ("**Will Find**"). Will Find was, in turn, owned by Scientigo, Inc. ("**Scientigo**") and SEO Holdings, LLC ("**SEO**").

8

42. The Controlling Noteholders, along with Bercoon and Goldstein, were also affiliated with Scientigo and SEO.

43. Goldstein, through an entity controlled by him, was a shareholder in Scientigo.

44. Upon information and belief, Bercoon was directly or indirectly the primary owner of SEO.

45. Defendants White, Attkisson, and Lowder were all, at one point, directors of Scientigo and were also shareholders of Scientigo. Defendant White was also, at one point, the president and chief executive officer of Scientigo. Defendants CrossHill, Hendrickson, Lovelace and Waldo were also shareholders of Scientigo.

46. All of the Controlling Noteholders were also holders of certain notes issued by Scientigo (the "**Scientigo Notes**") that were purportedly secured by substantially all of Scientigo's assets. The collateral agent for the Scientigo Notes were Defendant CrossHill and IFS Holdings, Inc. ("**IFS Holdings**"), an entity controlled by Defendant Attkisson.

47. On June 30, 2010, GNZR acquired ownership of the Domain Name as part of a complex restructuring transaction that involved a consensual foreclosure of the Scientigo Notes. The transaction included the following steps:

　　　　a. SEO forfeited its interests in Will Find thus making Scientigo the 100% owner of Will Find and the indirect owner of the Domain Name;

　　　　b. CrossHill and IFS Holdings, as collateral agents for the Scientigo Notes, formed URL Holding and, through a consensual foreclosure with Scientigo, foreclosed on the Domain Name and transferred ownership of the Domain Name to URL Holding. All prior holders of the Scientigo

Notes became members of URL Holding in proportion to their prior ownership of Scientigo Notes.

    c.    The members of URL Holding (the prior holders of Scientigo Notes) then contributed their membership interests in URL Holding to GNZR in exchange for their proportionate share of 1 million shares of stock in GNZR plus their proportionate share of new secured notes to be issued by GNZR in the amount of the then-outstanding balance of the prior Scientigo Notes. The notes issued in this transaction are the GNZR Notes at issue in this lawsuit.

48.    Thus, through this series of transactions, GNZR acquired ownership of URL Holding which owned the Domain Name. In exchange, the prior holders of the Scientigo Notes (including the Controlling Noteholders) received (i) shares in GNZR and (ii) the GNZR Notes.

49.    Notably, through these transactions, which were largely spearheaded by the Controlling Noteholders, the prior holders of the Scientigo Notes were attempting to receive value greater than the principal amount of the prior Scientigo Notes. Not only did the holders of the prior Scientigo Notes receive GNZR Notes with a greater principal amount than the prior Scientigo Notes, they also received common stock of GNZR. GNZR did not receive any cash infusion as a result of these transactions and remained woefully uncapitalized.

50.    Although GNZR became the sole owner of URL Holding as a result of these transactions, the Noteholders also attempted to retain control rights with respect to URL Holding. For instance, the Third Operating Agreement of URL Holding (the "**URL Operating Agreement**") provided that until the GNZR Notes were paid in full, then the directors of URL Holding could only be appointed by the collateral agent for the GNZR Notes.

10

51.     In addition, the URL Operating Agreement contained a provision purportedly giving the Noteholders the ability to unilaterally cancel GNZR's membership interest in URL Holding and issue new membership interest to the collateral agent for the benefit of the Noteholders.

## C.     GNZR Defaults On The Notes

52.     GNZR defaulted on the GNZR Notes almost immediately upon their issuance. GNZR failed to make the initial principal payment due on July 1, 2010.  In November, 2010, less than five months after the GNZR Notes were issued, the Collateral Agent formally declared the Notes to be in default.  No payments of principal or interest have ever been made on the GNZR Notes.

### (i)     The Forbearance Agreement

53.     On or around November 20, 2010, GNZR, the collateral agent for the GNZR Notes, and URL Holding approved a Note Amendment and Forbearance Agreement (the "**Forbearance Agreement**").  Under the Forbearance Agreement, the Noteholders agreed to forbear from exercising any enforcement rights until March 15, 2011.

54.     In addition, the Forbearance Agreement amended the GNZR Notes to provide that they could be amended by holders of at least a majority of the outstanding principal amount of the notes so long as the approval included the approval of Defendant CrossHill.  Prior to this amendment, the Notes could be amended only with 85% approval of the Noteholders.  Thus, it was through the Forbearance Agreement that the Controlling Noteholders assumed control over the actions of the Noteholders, and Defendant CrossHill obtained the right to veto any actions of the Noteholders that it disagreed with.

11

55.     The Forbearance Agreement also provided that upon approval of at least a majority of the outstanding principal amount of the notes (so long as the approval included the approval of Defendant CrossHill), the GNZR Notes could be converted into another class of security issued by GNZR or another issuer.

56.     The Forbearance Agreement further provided the collateral agent with the right to appoint two persons to observe all board meetings of GNZR.

57.     Defendants Lowder and Lovelace executed the Forbearance Agreement on behalf of the collateral agent.  Defendant White executed the Forbearance Agreement in her capacity as an officer of URL Holding.

### (ii)     The First Addendum

58.     On or around April 18, 2012, GNZR, Phoenix (as collateral agent), and URL Holding approved a First Addendum to Forbearance Agreement ("**First Addendum**"). Pursuant to the First Addendum, the forbearance period was extended until January 2, 2014.  The First Addendum further provided that interest would no longer accrue under the GNZR Notes, and all prior accrued interest was cancelled.

59.     The First Addendum also provided that GNZR would issue to each of the Noteholders their proportionate share of 1,460,125 shares of GNZR common stock. This stock issuance was characterized as a fee and not a payment to reduce the amount of the GNZR Notes. In addition, the First Addendum provided that Defendants CrossHill, Lovelace, Hendrickson, Lowder and White would receive an additional 500,000 shares of common stock as compensation for making a  "loan" of $50,000 to GNZR.

60.     The First Addendum was executed by Defendants White and Attkisson on behalf of Phoenix (as collateral agent) and by Defendant White in her capacity as an officer of URL Holding.

### (iii)     The Second Addendum

61.     On or around May 30, 2014, GNZR and Phoenix (as collateral agent) entered into a Second Addendum to Forbearance and Note Amendment Agreement (the "**Second Addendum**").

62.     Pursuant to the Second Addendum, the forbearance period was extended until January 2, 2016. The Second Addendum also confirmed that no interest was owed, or accruing, on the GNZR Notes.

63.     The Second Addendum was executed by Defendants Lowder and Lovelace on behalf of Phoenix as collateral agent.

### (iv)     The Third Addendum

64.     On or around June 29, 2016, GNZR and Phoenix (as collateral agent) entered into the Third Addendum to Forbearance and Note Amendment Agreement (the "**Third Addendum**").

65.     Pursuant to the Third Addendum, Phoenix agreed to forbear from exercising any remedies under the Notes until January 2, 2017.  The Third Addendum again confirmed that all accrued interest had been cancelled and that no interest was owed on the Notes.

66.     The Second Addendum was executed by Defendants Lowder and Lovelace on behalf of Phoenix as collateral agent.

**D.      Richard Morrell Is Retained as CEO of GNZR.**

67.      In July 2013, Richard Morrell was retained as the new CEO of GNZR.  Mr. Morrell had no prior relationship with GNZR or the Controlling Noteholders.  Richard Morrell also had no prior relationship with Bercoon or Goldstein.

68.      After Richard Morrell was retained as the new CEO of GNZR in 2013, GNZR began the process of locating all of the Technology Assets previously acquired from Find.Com Acquisition to identify the components, licensed software rights and functionality of the Technology Assets.

69.      Before Mr. Morrell was retained, GNZR had already written down the value of the Technology Assets from $1.3 million to $200,000.

70.      Based upon the further review of the Technology Assets led by Mr. Morrell, the value of the Technology Assets was written down further to $1.  Thus, it was determined that the Technology Assets originally acquired from Find.Com Acquisition were worthless.

71.      As part of its review of the Technology Assets, GNZR also discovered that Google had placed indexing restrictions against the Find.Com Domain Name.  Through the efforts of Mr. Morrell, GNZR was able to remove the Google penalty in June, 2014.

72.      During this time, GNZR also had to resolve litigation filed by Emmanual Fialkow, another former business associate of Bercoon and Goldstein.  GNZR ultimately prevailed in this litigation but was forced to incur legal fees of more than $250,000 in the process.

**E.      Bercoon and Goldstein Are Convicted of Securities Fraud**

73.      As discussed above, Bercoon and Goldstein were officers of Find.Com Acquisition, the entity that conveyed the worthless Technology Assets to GNZR.  Bercoon and

Goldstein, along with the Controlling Noteholders, were also affiliated with Scientigo, the entity that ultimately transferred the Domain Name to GNZR. Matthew Krieg, the CEO of GNZR prior to May 2013, was also, upon information and belief, a former business associate of Bercoon and Goldstein.

74.    On January 21, 2015, Bercoon and Goldstein were indicted for mail and wire fraud in connection with their solicitation of investments in Find.Com Acquisition. Among other things, the indictment alleged that Bercoon and Goldstein defrauded investors of Find.Com Acquisition by making false statements regarding how invested funds would be used and by using funds from investors for their own personal purposes.

75.    On July 24, 2018, Bercoon and Goldstein were found guilty for committing mail and wire fraud related to Find.Com Acquisition and sentenced to ten years in prison.

**F.    GNZR's Technology Development.**

76.    After his retention in 2013, Mr. Morrell also led GNZR's efforts to develop the company's technology utilizing the Domain Name. Specifically, the company focused its efforts on developing an alternative to the dominant internet search providers that would allow users the ability to create their own search engines and exclude results from unwanted sites. The technology would also have given users enhanced control over how search results are displayed and how users navigated through the search results.

77.    The company conducted extensive market research regarding its proposed technology, including working with student organizations at three universities, conducting focus groups, and gathering surveys. The company learned that the Find.com Domain Name gave the company instant credibility with users and advertisers.

78.    While the company was able to begin the development of its technology, the company needed to raise additional funds.  Unfortunately, given the company's complicated history, the existence of the Fialkow litigation, and the criminal prosecution of Bercoon and Goldstein, outside investors were reluctant to invest any significant funds in GNZR's development efforts.

79.    The only significant funds that GNZR was able to raise during this time period were additional investments from some existing Noteholders and funds loaned by Mr. Morrell and the husband of GNZR's then-CFO.  In addition, during this period, Mr. Morrell and other officers of the company deferred their compensation to help the company conserve cash.

80.    In November 2017, the company determined that it needed at least an additional $350,000 to complete development of a working prototype that could be shown to potential investors.    After it was unsuccessful in its fundraising efforts, the company terminated all employees and ceased all development efforts in early 2018. Since that time, the company has not had any active operations and has existed solely to maintain its rights to the Find.Com Domain Name and explore alternative ways to either restructure its financial obligations or find another way to monetize its key asset.

**G.    Negotiations with the Controlling Noteholders.**

81.    In January 2018, the Controlling Noteholders informed the company that they wanted to evaluate restructuring and fundraising options. To allow the Controlling Noteholders time to explore potential alternatives, the company elected not to pursue bankruptcy alternatives at that time.

82.    In September, 2018, the Controlling Noteholders first threatened to foreclose on the Domain Name.

83.     Because the Controlling Noteholders were apparently no longer interested in raising additional funds or pursuing any restructuring and, instead, intended to foreclose upon the Domain Name, GNZR informed the Controlling Noteholders in September, 2018 that the company was going to explore opportunities to sell the Domain Name and distribute proceeds to all stakeholders.

84.     Having received no response or objection from the Controlling Noteholders, GNZR prepared a draft press release to inform the public that GNZR was considering various alternatives to monetize the Domain Name including partnerships, joint ventures or possibly an asset sale.

85.     When GNZR provided the draft press release to the Controlling Noteholders, they objected and argued that it was premature to conduct a sale process. Recognizing that it was not possible to pursue an alternative transaction without either (a) the agreement of the Controlling Noteholders or (b) litigation to determine the rights of the Controlling Noteholders, GNZR elected not to issue the proposed press release and, instead, to pursue alternative transactions in a confidential manner.

86.     In May 2019, the Controlling Noteholders provided GNZR with a proposal for a consensual foreclosure.  Under the proposal from the Controlling Noteholders, the Domain Name would be transferred to Phoenix as collateral agent for the Noteholders.  In the event of the subsequent sale of the Domain Name, the proceeds would be disbursed <u>first</u>, to Phoenix for compensation of all outstanding expenses claimed for service as collateral agent and to establish a reserve fund for future expenses, <u>second</u>, to the Noteholders up the amount of the GNZR Notes, <u>third</u>, to GNZR up to an amount to be determined, and <u>fourth</u>, the amount of any excess to

the Noteholders.  Thus, under the Controlling Noteholders' proposal, the Noteholders would

potentially receive more than the amount outstanding under the Notes.

87.     On May 23, 2019, the Controlling Noteholders, through an attorney named Carl

Sollee, sent GNZR proposed documents to effectuate the consensual foreclosure.

88.     In early July 2019, GNZR responded to the Controlling Noteholders' proposal

and asked for additional information to allow the company to evaluate the proposal.

89.     On July 7, 2019, instead of providing the information requested by GNZR, the

Controlling Noteholders, again through attorney Carl Sollee, informed GNZR for the first time

that, pursuant to the operating agreement for URL Holding, the Controlling Noteholders believed

that all of GNZR's membership interests in URL Holding had been cancelled as of March, 2017.

The email further informed GNZR that the Controlling Noteholders had purportedly appointed

Defendants White and Lovelace to serve as directors of URL Holding.

90.     On July 24, 2019, counsel for GNZR sent a response letter to Carl Sollee.  In that

response, counsel for GNZR explained the following:

- GNZR could not agree to the proposed consensual foreclosure because the
  proposal from the Controlling Noteholders would provide for residual value from
  the sale of the Domain Name to go to the Noteholders rather than to the
  shareholders of GNZR.

- The provision in the operating agreement for URL Holding that purportedly
  allows the Noteholders to cancel GNZR's interests in URL Holding is
  unenforceable because it was designed to circumvent certain non-waivable
  provisions contained in Article 9 of the Uniform Commercial Code.  If the
  Controlling Noteholders wanted to attempt to foreclose on the Domain Name, any

18

foreclosure sale would need to be commercially reasonable as required by Article 9.

- To the extent the Controlling Noteholders had appointed Defendants White and Lovelace to serve as directors of URL Holding, the directors were obligated to act in the best interests of the company and not the interests of the Noteholders.

91.     In addition, the July 24, 2019 response letter from GNZR's counsel informed Carl Sollee that he had a conflict of interest due to his prior representation of GNZR.

**G.     GNZR Receives Proposals for the Domain Name.**

92.     In July 2019, at the same time that the Controlling Noteholders were attempting to unilaterally gain control of URL Holding, GNZR received a proposal from a third party for a licensing arrangement that would have provided monthly revenue to GNZR and give the third party a two-year option to purchase the Domain Name for a significant amount.

93.     In August 2019, GNZR received another proposal that would have provided GNZR with licensing revenue and provide the third party a 3-year option to purchase the Domain Name for an amount well in excess of the amount owed to the Noteholders.

94.     Upon receiving the proposals, GNZR suggested to the Controlling Noteholders that the parties agree to a 90-day standstill period to allow GNZR time to pursue these potential opportunities.

95.     In response, the Controlling Noteholders said that they would only agree to a 14-day standstill period and requested additional details regarding the potential transactions.

96.     GNZR informed the Controlling Noteholders that it would be willing to provide them with details regarding the proposed transactions provided that the Controlling Noteholders

executed an appropriate non-disclosure agreement.  A proposed non-disclosure agreement was provided to the Controlling Noteholders on August 28, 2019.

97.    None of the Controlling Noteholders agreed to execute the proposed non-disclosure agreement, nor did they provide any suggested revisions to the proposed non-disclosure agreement.  Instead, the Controlling Noteholders, through Steven Graham the general partner of Defendant CrossHill, informed GNZR that the Controlling Noteholders were not willing to pursue either transaction despite not even knowing the terms of the proposals.

98.    In October, 2019, GNZR received yet another inquiry from another interested party that proposed paying an amount well in excess of the amount owed to the Noteholders over a five-year period in exchange for use and ownership of the Domain Name.

99.    Later in October 2019, in a last-ditch attempt to try to reach a consensual agreement with the Controlling Noteholders, Richard Morrell sent an email to Defendants White and Lovelace in which he outlined the framework for a potential resolution.  Defendants White and Lovelace never responded to this proposal.

100.    Given the reality that (a) absent litigation, GNZR could not pursue any proposal without the consent of the Controlling Noteholders and (b) the Controlling Noteholders refused to engage in discussions regarding any proposal other than a foreclosure that would allow them to receive more than the amount owed on the Notes, GNZR determined that its only option was to commence a chapter 11 bankruptcy case to pursue a transaction for the Domain Name.

### FIRST CAUSE OF ACTION
### Recharacterization of Debt as Equity (Against All Defendants)

101.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

102.   Section 105 of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

103.   In the Fourth Circuit, "recharacterization is well within the broad powers afforded a bankruptcy court in § 105(a) and facilitates the application of the priority scheme laid out in § 726."  *In re Dornier Aviation (North America), Inc.*, 453 F.3d 225 (4th Cir. 2006).

104.   In this case, the following factors, among others, demonstrate that the GNZR Notes are not true debt instruments and should, instead, be recharacterized as equity interests:

    a.   The GNZR Notes were in default immediately upon their issuance;

    b.   No payments have ever been made on the GNZR Notes since they were issued almost 10 years ago;

    c.   GNZR was inadequately capitalized when the GNZR Notes were issued and was unable to obtain financing from outside lending institutions;

    d.   When the GNZR Notes were issued, the Noteholders also received shares in GNZR in proportion to their holdings of GNZR Notes;

    e.   Through various provisions contained in the Operating Agreement for URL Holding, the Noteholders attempted to retain control over the actions of GNZR including (i) the right to appoint two directors of URL Holding and (ii) the right to approve or disapprove any act that otherwise required the consent of the members of URL Holding;

    f.   Although the GNZR Notes have been in default for almost ten years, the Noteholders have never commenced any enforcement action, and the most recent forbearance agreement expired more than three years ago;

105.    Accordingly, the GNZR Notes should be recharacterized as equity interests in GNZR and, therefore, subordinated to claims arising out of true debt transactions for all purposes in this Bankruptcy Case.

## SECOND CAUSE OF ACTION
### Equitable Subordination (Against the Controlling Noteholders)

106.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

107.    Section 510(c) of the Bankruptcy Code provides that after notice and a hearing, the bankruptcy court may under the principles of equitable subordination either:

    a.  Subordinate for purposes of distribution all or part of an allowed claim or interest to all or part of another allowed claim or interest; or,

    b.  Order that any lien securing such subordinated claim be transferred to the estate.

108.    The Controlling Noteholders engaged in inequitable conduct, which resulted in injury to creditors and/or conferred an unfair advantage to the Controlling Noteholders.

109.    In addition to the other conduct of the Controlling Noteholders alleged herein, the Controlling Noteholders refused to even consider proposals that would have allowed the GNZR Notes to be paid in full and provided a distribution to other creditors.

110.    Instead, the Controlling Noteholders attempted to force GNZR to surrender the Domain Name to the Controlling Noteholders so that the Controlling Noteholders could capture value in excess of the amount of their legitimate claims.

111.    GNZR and all of its stakeholders have been harmed by the conduct of the Controlling Noteholders.

112.    Accordingly, in the event that the GNZR Notes are not recharacterized as equity interests, the GNZR Notes held by the Controlling Noteholders should be subordinated to the claims of all other unsecured creditors.

### THIRD CAUSE OF ACTION
### Declaratory Judgment That The Purported Cancellation of GNZR's
### Membership Interests in URL Holding Is Void and of No Effect

113.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

114.    Section 6.11 of the operating agreement for URL Holding contains a provision that purportedly gives the collateral agent for the Noteholders the right to unilaterally cancel GNZR's membership interests in URL Holding and issue new membership interests in URL Holding to the collateral agent for the benefit of the Noteholders.

115.    The sole purpose of this provision is to allow the Noteholders the ability to foreclose on GNZR's membership interests in URL Holding without complying with the provisions of Article 9 of the UCC.

116.    Relying on this provision, the Controlling Noteholders, through counsel, informed GNZR on July 7, 2019, that GNZR's membership interests in URL Holding had purportedly been cancelled effective as of March 3, 2017.

117.    Prior to July 7, 2019, neither the Noteholders nor Phoenix, as collateral agent, provided any notice to GNZR that they considered GNZR's membership interests in URL Holding to have been cancelled in March, 2017.  To the contrary, at all points prior to July 7, 2019, the Noteholders and Phoenix had acted as if GNZR was the sole member of URL Holding.

118.    The GNZR Notes are governed by Georgia law.

119.    Pursuant to O.C.G.A. § 11-9-611, a borrower must be provided with notice before there is any disposition of collateral.  Similarly, under O.C.G.A. § 11-9-620, a secured creditor may accept collateral in full or partial satisfaction of a secured debt only if either (a) the debtor consents or (b) the debtor does not object after receiving a written notice form the secured creditor of the proposed acceptance of collateral.  In addition, under O.C.G.A. § 9-610(b), any disposition of collateral must be commercially reasonable.

120.    Pursuant to O.C.G.A. § 11-9-602, the obligations imposed upon by the foregoing sections cannot be waived or altered.

121.    The provisions in the operating agreement of URL Holding which purport to give the Noteholders the unilateral right to cancel GNZR's membership interests in URL Holding are directly contrary to these non-waivable provisions of the UCC and are, therefore, void and of no effect.

122.    Because the provisions in the operating agreement of URL Holding which purport to give the Noteholders the unilateral right to cancel GNZR's membership interests in URL Holding are void and of no effect, the purported cancellation of GNZR's membership interests is similarly void and of no effect.

123.    An actual controversy exists between GNZR and the Noteholders regarding the ownership of URL Holding.

124.    GNZR is entitled to a declaration that the purported cancellation of its membership interests in URL Holding was invalid and that GNZR remains the sole member of URL Holding.

## FOURTH CAUSE OF ACTION
### Declaratory Judgment That GNZR Is Authorized to
### Commence a Chapter 11 Bankruptcy Case on Behalf of URL Holding

125.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

126.    Section 6.03 of the operating agreement for URL Holding provides that until the GNZR Notes are paid in full, the collateral agent for the Noteholders has the right to appoint two directors of URL Holding.

127.    The initial directors appointed by the collateral agent for the Noteholders were Defendants White and Attkisson.

128.    By letter agreement that was executed on or about the same date that the operating agreement for URL Holding was executed, the URL Operating Agreement was amended to clarify that Defendants White and Attkisson were being appointed as directors of URL Holding "solely for the purpose of protecting the collateral securing the Generation Zero Notes."

129.    At some point subsequent to the retention of Richard Morrell as CEO of GNZR, Defendants White and Attkisson resigned as directors of URL Holding.  From that point forward, Richard Morrell managed URL Holding in his capacity as president of URL Holding and as the CEO of GNZR, the sole member of URL Holding.

130.    By email dated July 7, 2019, the Controlling Noteholders, through counsel, informed GNZR that Defendants White and Lovelace had been appointed by the collateral agent to serve as directors of URL Holding.  Pursuant to the prior amendment to the operating agreement, Defendants White and Lovelace were appointed as directors "solely for the purpose of protecting the collateral securing the Generation Zero Notes."

25

131.    The purpose of the appointment of Defendants White and Lovelace by the Controlling Noteholders was to attempt to prevent URL Holding from filing for bankruptcy without the consent of the Controlling Noteholders.

132.    Courts have routinely held that provisions in limited liability operating agreements that allow lenders the ability to appoint directors for the purpose of blocking a bankruptcy filing are void as a matter of federal policy.  *See*, *e.g.*, *In re Lake Michigan Beach Pottwatamie Resort, LLC*, 547 B.R. 899 (Bankr. N.D. Ill. 2016); *In re Intervention Energy Holdings, LLC*, 553 B.R. 259 (Bankr. D. Del. 2016); *In re Lexington Hospitality Group LLC*, 577 B.R. 676 (Bankr. E.D. Ky. 2017).

133.    Accordingly, the provisions in the URL Holding operating agreement that purport to allow the Noteholders to appoint 2 directors of URL Holding or otherwise take action that would prevent URL Holding from exercising its right to file for bankruptcy are void as a matter of federal law.

134.    Under applicable state law, GNZR, as the sole member of URL Holding, has the authority to commence a bankruptcy case on behalf of URL Holding.

135.    A dispute exists between the Noteholders, GNZR and URL Holding regarding the authority of GNZR to commence a bankruptcy case on behalf of URL Holding.

136.    GNZR is entitled to a declaration that, as the sole member of URL Holding, it has the authority to commence a bankruptcy case on behalf of URL Holding.

## FIFTH CAUSE OF ACTION
## <u>Appointment of a Receiver</u>

137.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

138.   In the event that it is determined that GNZR lacks authority to commence a bankruptcy filing on behalf of URL Holding, appointment of a receiver over the assets of URL Holding is necessary to preserve the value of URL Holding for all of GNZR's stakeholders.

139.   Federal Rule of Bankruptcy Procedure 7064 provides that upon the commencement of an adversary proceeding, every remedy is available that would be available under the law of the state where the court is located.

140.   N.C. Gen. Stat. § 1-507.1 authorizes the appointment of a receiver over a corporation when the corporation is insolvent or suspends its ordinary business for want of funds.

141.   While GNZR believes that it is authorized to commence a bankruptcy case on behalf of URL Holding and that such a case would maximize the value of URL Holding, in the event it is determined that GNZR cannot commence a bankruptcy case for URL Holding without the consent of the Noteholders, then appointment of a receiver over the assets of URL Holding will be necessary to preserve the value of URL Holders for all stakeholders.

142.   The Controlling Noteholders have previously indicated that they will not consent to any transaction other than a consensual foreclosure pursuant to which URL Holding simply transfers the Find.Com Domain Name to Phoenix, as collateral agent.

143.   The two directors of URL Holding that were purportedly appointed by the collateral agent are also Controlling Noteholders and have a direct conflict of interest.

144.   If a neutral third-party receiver is appointed, the value of the Find.Com Domain Name can be maximized and proceeds can be distributed in accordance with priorities as determined by the Court.

145.    Accordingly, in the event that it is determined that GNZR lacks authority to commence a bankruptcy filing on behalf of URL Holding, appointment of a receiver over the assets of URL Holding is necessary and appropriate.

### SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty (Against the Controlling Noteholders)

146.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint.

147.    By virtue of their actions and the degree of control they asserted over the Debtors' business affairs, the Controlling Noteholders owed a fiduciary duty to the Debtors.

148.    In addition, Defendants White and Lovelace were purportedly appointed as directors of URL Holding.

149.    Despite owing a fiduciary duty to the Debtors, the Controlling Noteholders refused to even evaluate transactions that would potentially pay the Noteholders in full and, instead, insisted on pursuing a transaction that would have transferred all value of the Find.Com Domain Name to the Noteholders.

150.    Based on the Controlling Noteholders' refusal to even consider transactions, the Debtors have lost valuable opportunities to pursue transactions that would have provided a benefit to all stakeholders.

151.    The Debtors are entitled to damages in an amount to be determined at trial as a result of the Controlling Noteholders' breach of fiduciary duty.

WHEREFORE, Debtors respectfully request that the Court enter an Order and Judgment:

(a)    Recharacterizing the GNZR Notes as equity interests in GNZR;

28

(b)    In the event that the GNZR Notes are not recharacterized as equity intererts, equitably subordinate the claims held by the Controlling Noteholders to the claims of other unsecured creditors;

(c)    Declaring that the purported cancellation of GNZR's membership interests in URL Holding is void and of no effect;

(d)    Declaring that GNZR is authorized to commence a bankruptcy case on behalf of URL Holding;

(e)    In the event that it is determined that GNZR lacks authority to commence a bankruptcy case on behalf of URL Holding, appointing a receiver over the assets of URL Holding;

(f)    Awarding damages against the Controlling Noteholders as a result of their breach of fiduciary duty in an amount to be determined at trial; and,

(g)    Awarding such other relief as the court deems just and appropriate.


This the 13th day of March, 2020.


/s/ Felton E. Parrish
Felton E. Parrish
NC Bar No. 25448
HULL & CHANDLER, P.A.
1001 Morehead Square Drive, Suite 450
Charlotte, NC 28203
(704) 375-8488 phone
(704) 512-0525 fax
fparrish@lawyercarolina.com

*Attorneys for Debtors*

**Exhibit A**

**List of Passive Noteholders**

| Name | Address |
|------|---------|
| Helene A. Odom | 238 TERRANE RIDGE, PEACHTREE CITY, GA 30269 |
| JANE E MEDLOCK  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| JOHN VELKY  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| JOHN VELKY | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| Harry Walker Investments, LLC | P.O. BOX 2205, COLUMBUS, GA 31904 |
| Michael O'Hara & Lisabeth L. O'Hara | 105 MEADO RIDGE, DOYLESTOWN, OH 44230 |
| JACQUELYN S BROOKS  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| Barry S. Bryant | 324 SHORELINE DR. EAST, NORTH AUGUSTA, SC 29841-5409 |
| Russell J. Bruemmer | 4024 NORTH 40TH STREET, ARLINGTON, VA 22207 |
| James L McGovern | 11 WHISTLING SWAN, HILTON HEAD, SC 29928 |
| CAROLINE T RICHARDSON  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| MICHAEL C. & PAM K. ROGERS | 250 LEE RD., FAIR PLAY, SC 29643 |

| | |
|---|---|
| HORACE G. BLALOCK | 2721 KNOB HILL FARM ROAD, EVANS, GA 30809 |
| HORACE BLALOCK  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| Henry Alperin,  IRA | 1 EAGLE COURT, AUGUSTA, GA 30909 |
| M DIXON MCKAY | 1509 CHESTER ROAD, RALEIGH, NC 27608 |
| CAROLYN MULHERIN | 1 REID COURT, AUGUSTA, GA 30909 |
| JAMES KELLEY | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| DANA M PETERSON | 2440 LOTHIAN ST, HENDERSON, NV 89044 |
| DEAN DURAND | 414 RIVER NORTH DRIVE, NORTH AUGUSTA, SC 29841 |
| DEAN & JOY DURAND | 414 RIVER NORTH DRIVE, NORTH AUGUSTA, SC 29841 |
| Collin Royster | American Capital Partners, LLC, 6000 Lake Forest Drive NW Suite 3, Atlanta, GA 30328 |
| MATTHEW K BECKSTEAD Revoc Trust for ROD K BECKSTEAD TTEE | 784 E 450 N, HEBER CITY, UT 84032 |
| Rod Beckstead | 784 E 450 N, HEBER CITY, UT 84032 |
| George Parker Swift VI & Paige Swift | 6475 WATERFORD ROAD, COLUMBUS, GA 31904 |
| CHARLES DANIEL  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |

| | |
|---|---|
| Bryan Coats, IRA | PO BOX 2050, JERSEY CITY, NJ 7303 |
| MidSouth Capital | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| KENNETH SIMPSON  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| JOHN WILLIAM THURMOND III, IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| William & Mariam DUNN | 5399 KEOWEE ROAD, HONEA PATH, SC 29654 |
| WILLIAM A DUNN  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| David G. Bell | P.O. BOX 2083, CORNELIUS, NC 28031 |
| Lawrence E. Mobley, III  SEP/IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| Sean P. Coughlin, IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| Sean P. Coughlin | 13318 BONICA WAY, WINDERMERE, FL 34786 |
| WENDEL B. ARDREY | 1904 WALTON WAY, AUGUSTA, GA 30904 |
| KEVIN & MICHELLE FOGARTY | 1948 MAHRE DRIVE, PARK CITY, UT 84098 |
| NANCY LOCKLEAR  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |

| | |
|---|---|
| J. Dickey Boardman | 2715 HILLCREST AVENUE, AUGUSTA, GA 30909 |
| TOM LEONARD  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| STEPHEN F. CONNOLLY  IRA | 511 MARQUETTE AVENUE, MINNEAPOLIS, MN 55403 |
| BRENT TESSMANN  IRA | 868 Longleaf Place, Minden, NV  89423 |
| KEVIN GOLDSMITH | 560 WALTON WAY, AUGUSTA, GA 30901 |
| RANDALL REDMOND | 1456 JONES STREET, AUGUSTA, GA 30901 |
| JAMES HILLIS JR | 354 JAKE WHORTON ROAD SE, SILVER CREEK, GA 30173 |
| Mulford Waldrop | 3441 BARSCHALL DRIVE, COLUMBUS, GA 31904 |
| Kyle W. Pulliam | 795 SPARKLEBERRY ROAD, EVANS, GA 30809 |